

## OPERATING AGREEMENT

## CONTROLBOX.COM, LLC

This Operating Agreement (this "**Agreement**") of CONTROLBOX.COM, LLC, a Michigan limited liability company (the "**Company**"), is made effective as of January 1, 2012 by those persons or entities set forth on **Exhibit A** hereto, which may be amended from time to time as set forth herein (each a "**Member**" and collectively the "**Members**") and the Company.

1.  **Name.** The name of the Company is CONTROLBOX.COM, LLC.

2.  **Purposes and Powers.** The Company is organized for the purpose of engaging in any lawful act or activity for which a limited liability company may be organized under the laws of the State of Michigan.

3.  **Term.** The Company commenced upon the filing of the Company's Articles of Organization in the Office of the Secretary of State of the State of Michigan by Steven J. McAuley ("**McAuley**") on September 20, 2010 and shall continue until the Board (as defined below) consents to the Company's dissolution.

4.  **Members; Capital Commitments; Membership Units.**

    (a)     The economic interests in the Company shall be represented by membership interest units (the "**Units**"). Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company and the right to vote on certain matters as provided in this Agreement, shall be represented by the Units owned by such Member. The ownership of Units shall entitle each Member to allocations of income and loss and other items and distributions of cash and other property as set forth in this Agreement. The Company shall have two (2) classes of Units: Class A Units and Profit Units. Each Class A Unit shall entitle the Member owning such Class A Unit to one vote on any matter voted on by the Members as provided in this Agreement or as required by applicable law. Except as otherwise provided herein or as required by law, Profit Units shall be non-voting.

    (b)     The name, place of residence and capital commitment ("**Capital Commitment**") to the Company of each Member and the number and class of Units held by each Member are set forth on **Exhibit A** attached hereto and incorporated herein by reference. In no event shall any Member be required to contribute any amount in excess of such Member's Capital Commitment as set forth on **Exhibit A.**

    (c)     Subject to the terms of this Agreement, upon the consent of the Board, the Company may issue additional Units to existing Members or to third parties, provided, however, that no person or entity shall become a Member unless and until such person or entity has explicitly accepted, assumed and agreed to be subject to and bound by all of the terms, obligations and conditions of this Agreement, as the same may have

been further amended by executing a Counterpart Signature Page and Agreement to be Bound, substantially in the form attached hereto as **Exhibit B**. Upon admission of an additional Member, **Exhibit A** shall be updated accordingly by the Board.

(d)     Subject to the terms of this Agreement, the Board shall have the right to cause the Company to grant not more than 220,000 Profit Units in the aggregate (the "**Pool**").

(e)     As a condition to granting and issuing Profit Units, the Board shall make a determination of the Fair Market Value of the assets of the Company. For purposes of this Agreement, "**Fair Market Value**" shall mean, at any time, the value that would be obtained for the applicable asset in an arm's-length sale for cash between an informed and willing purchaser and an informed and willing seller, neither being under any compulsion to buy or sell. Except as otherwise specified herein, Fair Market Value shall be determined by the Board in good faith.

(f)     At the time of the grant of each Profit Unit, such Profit Units shall be assigned a "**Threshold Value**" equal to the amount that would be distributed to a Member with respect to a Class A Unit if the Company were to sell the Company's assets for an amount equal to the Fair Market Value of such assets at such time, pay the Company's obligations (including, without limitation, those arising under Section 8(b)(i)) and distribute the remaining proceeds in accordance with Section 8(b)(ii). The Board shall have the sole authority and discretion to adjust a Profit Unit's Threshold Value in the event of an issuance or redemption of Units or other change to the capital structure of the Company so as to preserve the economic value inherent in the Profit Unit.

(g)     The Profit Units may be subject to vesting restrictions imposed by the Board at the time of grant and contained in the agreement for the Profit Units between the Company and the individual holder of such Profit Units. The vesting restrictions for individual holders of Profit Units may vary according to the individual holder.

(h)     For all Profit Units issued by the Company after the date hereof, the recipient of a Profit Unit must receive the Profit Unit for the provision of services to or for the benefit of the Company in a Member capacity or in anticipation of being a Member. Each Profit Unit issued pursuant to this Agreement is intended to be a profits interest within the definition contained in Internal Revenue Service Revenue Procedure 93-27 and Revenue Procedure 2001-43 and is issued with the intention, but without assurance or guaranty, that under current interpretations of the Internal Revenue Code of 1986, as amended (the "**Code**") the recipient will not realize income upon the issuance of the Profit Unit, nor the vesting of such Profit Unit, and neither the Company, nor any Member is entitled to any deduction, either immediately or through depreciation or amortization, as a result of the issuance of the interest. Therefore, if the Company was liquidated immediately after issuance of the Profit Units pursuant to this Agreement, before any appreciation occurred in the value of the assets owned at such time by the Company, whether such property is real, personal, tangible or intangible or is acquired by the Company as a result of Capital Commitments, operations or other means (such assets

2

being the "**Company Assets**"), and the Company Assets were sold at Fair Market Value and the proceeds distributed in complete liquidation of the Company, the recipients would not be entitled to receive any share of the proceeds of liquidation in respect to the Profit Units issued pursuant to this Agreement. At the discretion of the Board, the Company may elect to have the safe harbor described in IRS Notice 2005-43, as finalized in any administrative guidance issued on or after to the date of this Agreement, apply irrevocably with respect to all Profit Units transferred in connection with the performance of services while such election remains in effect. If the Company makes such election, the Company and each Member to which a Profit Unit is transferred in connection with the performance of services while such election remains in effect agree to comply with all requirements of the safe harbor with respect to such Profit Units, and any forfeiture allocations required to be made to enable the Company to qualify for the safe harbor are hereby authorized.

(i)    The recipient of any unvested Profit Units may file a protective income tax election under Internal Revenue Code Section 83(b) to include the Fair Market Value of such Profit Units in gross income in the year of receipt. The election shall be filed with the Internal Revenue Service within thirty (30) days after the issuance of such Profit Units, with a copy provided to the Company. The Company may, but is not required to provide assistance in the preparation and filing of such election, provided that if the Company does provide such assistance, each holder of Profit Units shall fully cooperate with the Company in such preparation and filing, and, at the request of the Company, shall execute the form of Section 83(b) provided by the Company and shall promptly deliver such form to the Company for timely filing with the Internal Revenue Service. Each Profit Unit holder will be solely responsible and liable for any taxes and tax consequences with respect to the receipt, ownership or disposition by such holder of Profit Units, and with respect to any and all distributions and allocations of profit and loss to such holder with respect to Profit Units, and the Company and the Members shall have no liability for any of the foregoing.

5.    **Management.**

(a)    The Company shall be managed by a Board of Managers (collectively, the "**Board**" and each member thereof, a "**Manager**") who shall be responsible for setting policies and procedures for the operation of the Company and the day-to-day operations of the Company. Except as set forth herein, the management and operation of the Company are vested exclusively in the Board and the Board shall have the power on behalf of and in the name of the Company to carry out and implement any and all of the objects and purposes of the Company. Each Manager shall have one vote on any matter voted on by the Board as provided in this Agreement or as required by applicable law. The Board shall initially consist of one (1) Manager, and Steven J. McAuley is hereby designated as the initial Board. The size of the Board may be increased or decreased in the discretion of the Board.

(b)    The Board may, from time to time, delegate to one or more persons (including any Member or officer or employee of the Company) such authority and

responsibility as the Board may deem advisable. Any delegation pursuant to this Section 5(b) may be revoked at any time by the Board. The compensation for such officers of the Company shall be determined in the discretion of the Board.

6.    **Vacancies; Removal; Resignation.**  Except as otherwise provided herein, any vacant Manager position to be filled due to an increase in the number of Managers or otherwise shall be filled by the remaining Managers. Managers may be removed only for Cause (as defined below) by the written consent of the Members holding at least a majority of the Class A Units. A Manager may resign at any time by providing at least thirty (30) days prior written notice to the Members. Any such resignation shall be made in writing and shall take effect on the date specified therein, or if no date is specified, on the date that is thirty (30) days after the receipt by the Members holding Class A Units of such written notice. For purposes of this Agreement, "Cause" means any action or failure to act by a Manager which constitutes willful misconduct, gross negligence, a knowing violation of law, fraud against the Company or the Members or a material breach of this Agreement or the disability of a Manager such that such Manager cannot perform such Manager's duties for a period equal to ninety (90) days in any three hundred sixty five (365) day period.

7.    **Allocations and Certain Tax Matters.**

(a)    **Allocation of Company Income or Loss.**  A capital account will be maintained for each Member in accordance with the rules set forth in Treasury Regulation Section 1.704-1(b)(2)(iv). At the discretion of the Board, the capital account may, in the circumstances described in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), be adjusted in accordance with such provision of the Treasury Regulations, provided that, following such a revaluation, the capital accounts shall be adjusted in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g). All income, gains, losses and expenses of the Company (after taking into account allocations made pursuant to Section 7(b)) will be allocated (for capital accounting purposes) so as to cause the sum of (i) each Member's capital account, (ii) the amount (if any) that each Member is unconditionally obligated to contribute to the Company, (iii) each Member's share of "partnership minimum gain" (as defined in Treasury Regulation Section 1.704-2(b)(2)), and (iv) each Member's "partner nonrecourse debt minimum gain" (as determined in accordance with Treasury Regulation Section 1.704-2(i)(3)), to be equal to the amount that would be distributed to such Member under this Agreement if the Company were to (A) liquidate the assets of the Company for an amount equal to the book value of such property as determined for capital account purposes as of the end of such fiscal period and (B) distribute the proceeds in accordance with Section 8 hereof.

(b)    **Regulatory Allocations.**  Notwithstanding the provisions of subsection (a) of this Section 7:

To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Sections 734(b) or 743(b) of the Code is required to be taken into account in determining capital accounts, the amount of such adjustment shall be treated, as provided in Treasury

Regulation Section 1.704-1(b)(2)(iv)(m), as an item of profit (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and such profit or loss shall be specially allocated to the Members in a manner consistent with the manner in which capital accounts are required to be adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Profits and losses for each taxable year or other period shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with appropriate adjustments as determined by the Board and the Company's accountants.

(i)      Notwithstanding anything to the contrary in this Section, if there is a net decrease in "partnership minimum gain" (determined in accordance with Treasury Regulation Section 1.704-2(d)(1)) during any taxable year, each Member shall be specially allocated profits for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in "partnership minimum gain", determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the "partnership minimum gain", if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Board may in the Board's discretion seek to have the Internal Revenue Service waive the minimum chargeback requirement in accordance with Treasury Regulation Section 1.704-2(f)(4).

(ii)      Notwithstanding the general allocations set forth in subsection (a) of this Section 7, the losses (or items thereof) allocated pursuant to subsection (a) of this Section 7 shall not exceed the maximum amount of losses that can be so allocated without causing or increasing a capital account deficit in any Member's capital account at the end of any taxable year (after such capital account has been reduced by the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4),(5) and (6)) in excess of any limited dollar amount of such capital account deficit that such Member is obligated to restore (or is deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and (i)(5)). If an allocation of losses pursuant to subsection (a) of this Section 7 would cause some but not all of the Members to have a capital account deficit or an increase in a capital account deficit, the limitation set forth in this paragraph (iii) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible loss to each Member under Treasury Regulation Section 1.704-1(b)(2)(ii)(d). To the extent of the cumulative amount of losses allocated to all Members while this subsection (b) of this Section 7 is in effect, any Members receiving such losses shall be allocated the next available profits, if any, up

to the cumulative amount of losses allocated to them pursuant to this subsection (b) of this Section 7.

(iii)    In the event any Member receives any adjustment, allocation or distribution that creates or increases a capital account deficit for such Member, as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), profits (consisting of a *pro rata* portion of each item of partnership income, including gross income and gain for such taxable year and if necessary for subsequent years) shall be specially allocated to such Member in an amount and manner sufficient to eliminate the capital account deficit or increase in capital account deficit (in excess of any limited dollar amount of such capital account deficit created by such adjustments, allocations or distributions that such Member is obligated to restore or deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and (i)(5)) as soon as practicable following such adjustment, allocation or distribution. This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(iv)    The allocations set forth in paragraphs (i), (ii) and (iii) of this Section 7(b) (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulation under Code Section 704. Notwithstanding any other provisions of this Section, the Regulatory Allocations shall be taken into account in allocating profits and losses among Members so that, to the extent possible, the net amount of such allocations of profits and losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(c)    **Curative Allocations**.  If the Tax Matters Partner (as defined below) determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Section (an "**unallocated item**") or that the allocation of any item of Company income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "**misallocated item**"), then the Board may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; provided, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company. Without limiting the generality of the foregoing, where it becomes apparent to the Tax Matters Partner that, after making all other allocations required to be made pursuant to this Agreement in respect of any taxable year of the Company (including the year of the Company's liquidation), any Member or transferee will have been allocated more cumulative profits (net of all previously allocated losses), over the life of the Company to date than such Member or transferee has received or is entitled to receive in cumulative distributions in excess of such Member's or transferee's capital contributions to the Company (such excess, "**excess allocated profit**"), then the Tax Matters Partner shall be permitted to allocate such items of

Company income, gain, loss, deduction or credit among all the Members and transferees in such manner as it reasonably deems appropriate in respect of such taxable year and if necessary any succeeding taxable years in order to eliminate such excess allocated profit, regardless of the allocations otherwise provided for in subsection (a) of this Section.

       (d)    **Tax Allocations.**  Except as otherwise provided in this paragraph or as otherwise required by the Code and the rules and Treasury Regulations promulgated thereunder, each item of Company income, gain, loss, or deduction for income tax purposes shall be allocated among the Members in the same proportion as the allocation of the corresponding item of income, gain, loss, or deduction as determined for capital account purposes.  Income, gain, loss and deduction with respect to any asset contributed to the capital of the Company (or treated as so contributed for federal income tax purposes) or that is otherwise reflected in the capital accounts at a book value different from its adjusted tax basis shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its book value as determined for capital account purposes utilizing any approved method described in the Treasury Regulations promulgated under Code Section 704(c) and chosen by the Board in its sole discretion.

       (e)    **Income Tax Consequences.**  Each Member is aware of the income tax consequences of the allocations made by this Section 7 and hereby agrees to be bound by the provisions of this Section 7 in reporting such Member's shares of Company profit and loss for income tax purposes.  Except as otherwise required by the Code and the rules and Treasury Regulation promulgated thereunder, each Member's distributive share of Company income, gain, loss, deduction, or credit for income tax purposes shall be the same as is entered in such Member's capital account pursuant to this Agreement.

       (f)    **Tax Matters Partner.**  Steven J. McAuley (so long as he is a Manager) shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code, or if Steven J. McAuley is not a Manager, the "tax matters partner" shall be a Manager that is designated as such by the Board (the "**Tax Matters Partner**").  Any Manager who is designated Tax Matters Partner shall take such action as may be necessary to cause each other Manager to become a "notice partner" within the meaning of Section 6223 of the Code.  Any Manager who is designated Tax Matters Partner shall inform each other Manager of all significant matters that may come to such Manager's attention in such Manager's capacity as Tax Matters Partner by giving notice thereof on or before the fifth business day after becoming aware thereof and, within that time, shall forward to each other Manager copies of all significant written communications such Manager may receive in that capacity.

       (g)    **Tax Return.**  The Board shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making any elections the Board may deem appropriate and in the best interests of the Members.  Each Member shall furnish to the Board all pertinent information in such Member's possession relating to Company operations that is necessary to enable the Company's income tax

returns to be prepared and filed. At the request of a Member, the Company shall make the election described in Section 754 of the Code.

**8.     Distributions to Members**.

(a)     Prior to making any distribution, the Board may, in the Board's sole discretion, cause the Company to (i) pay all fees and expenses of the Company, (ii) repay all outstanding indebtedness of the Company (other than indebtedness to Members), (iii) repay all loans made by Members to the Company, if any, and (iv) set aside such reserves as are deemed necessary by the Board to cover liabilities (contingent or otherwise) of the Company. The Board shall cause the Company to make distributions to the Members in amounts reasonably determined by the Board to be sufficient to satisfy the respective net income tax obligations of the Members arising as a result of the allocations of taxable income to such Members pursuant to Section 7 at the sum of the maximum tax rate applicable to individuals or corporations (as applicable) under the Code and under Michigan law (such distributions, "**Tax Distributions**"); provided, however, that if the Board has duly elected to pay obligations or set aside reserves as set forth in the first sentence of this Section 8(a), the Board shall cause the Company to make Tax Distributions only to the extent of funds available after such obligations have been paid and reserves set aside. For purposes of computing the amount of Tax Distributions to be made to the Members, any net taxable loss allocable to a Member for a taxable year of the Company may, at the Board's discretion, be treated as carrying forward to the subsequent taxable year of the Company. For purposes of this Section 8, Tax Distributions to a Member shall be treated as nonrecourse advances to the Member that shall be repaid from amounts otherwise distributable to such Member under Section 8(b). Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members if such distribution would violate the Michigan Limited Liability Company Act or other applicable law. At the discretion of the Board, any distributions in a fiscal year made under subsection (b) below in excess of Tax Distributions shall count against the requirement to make Tax Distributions in future years.

(b)     To the extent available after meeting the obligations of the Company set forth in subsection (a) of this Section 8, the Board may, in the Board's sole discretion, cause the Company to distribute any or all available cash, if any, to the Members in the manner and priorities set forth below:

(i)     *First*, 100% to the Members holding Class A Units, *pro rata* among such Members based on each such Member's aggregate unreturned Capital Commitments to the Company, if any, until the cumulative amount distributed pursuant to this Section 8(b)(i) is equal to each such Member's aggregate Capital Commitments to the Company; and

(ii)     *Thereafter*, 100% to the Members holding Participating Units, *pro rata* among such Members based on the aggregate number of Participating Units held by each such Member. For purposes of this Agreement, "**Participating Unit**"

shall mean (A) any Class A Unit, and (B) any vested Profit Unit, at such time when the aggregate per-Unit distributions made with respect to Class A Units pursuant to this Section 8(b)(ii) from and after the time at which such Profit Unit was issued are equal to or greater than such Profit Unit's Threshold Value.

9.     **Assignment.**

(a)     <u>General Prohibition</u>.   Other than Permitted Transfers (as defined below) or Transfers in accordance with Sections 9(b) - (e), no Member shall sell, assign, exchange or transfer, or offer to sell, assign, exchange or transfer or otherwise dispose of ("**Transfer**") all or any part of such Member's interest in the Company (whether voluntarily or involuntarily) (a) unless such assignment or transfer is in compliance with applicable federal and state securities laws and (b) without the written consent of the Board, which consent may be withheld in the reasonable discretion of the Board. "**Permitted Transfers**" shall include any transfer (i) from any individual Member to such Member's immediate family members or to a trust for the benefit of such Member or such Member's immediate family members or to a limited partnership, the partners of which are such Member's immediate family members or such Member; and (ii) from any entity Member to such Member's affiliates, provided that in each case the transferee agrees in writing to be subject to the terms of this Agreement to the same extent as if such transferee were an original Member hereunder; and (iii) from any Member to another Member and (iv) from any Member to the Company. Any sale, assignment, exchange or other transfer or disposition by any Member of any interest in the Company in contravention of this Agreement shall be void and ineffectual. In the case of any attempted transfer in violation of this Agreement, the parties engaging or attempting to engage in such transfer shall be liable to indemnify and hold the Company and the other Members harmless from all costs, liabilities and damages to the Company or any of such other Members (including, without limitation, incremental tax liability and fees and expenses of legal counsel) as a result of such transfer or attempted transfer and efforts to enforce the indemnity granted hereby. In no event shall any transferee of any interest in the Company be considered a Member unless such transferee is admitted as a Member in accordance with the provisions of this Agreement.

(b)     <u>Right of First Refusal</u>.   If a Class A Unit holder receives a bona fide offer from a third party for such third party to purchase any Class A Units held by such holder, which offer such holder intends to accept, before accepting such third party offer or consummating the sale to such third party, the holder shall notify the Company in writing of such offer, which notice shall state the number of Class A Units subject to such offer and the price and terms of payment offered by such third party. The Company shall have thirty (30) days after receipt by it of such notice within which to notify the holder, in writing, of its election to purchase all (but not less than all) of the Class A Units that are the subject of such third party offer at the same price and upon the same terms and conditions as are contained in such third party offer; provided, however, if the consideration offered by such third party consists in whole or in part of securities (including debt obligations) of the third party or an affiliate thereof or property other than cash, the Company shall have the right to pay the purchase price for such Units all in cash by substituting an amount of cash equal to

the fair market value of such securities or other property. Failure by the Company to give such written notice within such thirty (30) day period (the "**Acceptance Period**") shall constitute a rejection of such offer by the Company. If the Company rejects such offer or fails timely to accept such offer, or if after timely accepting such offer the Company fails timely to consummate the purchase of the Class A Units that are the subject of that offer, then such holder shall be free to sell the Class A Units that are the subject of such third party offer to the third party at the price and upon the same terms and conditions as are set forth in the third party offer. If the holder does not consummate the sale to the third party within ninety (90) days after rejection by the Company of the offer, or, if the offer is timely accepted by the Company, after failure of the Company timely to consummate the purchase, the Class A Units that were the subject of such third party offer shall once again become subject to the provisions of this Section 9(b), and any subsequent disposition of the Class A Units shall be made only after compliance with the terms of this Section 9(b). If the Company timely accepts the offer, the consummation by the Company of the purchase of Class A Units that are the subject of the offer shall be held at the offices of the Company not later than sixty (60) days following the date the Company gives written notice of its acceptance of the offer.

      (c)    <u>Tag-Along Rights</u>. If McAuley (including, for purposes of this Section 9(c), any Permitted Transferee of McAuley) intends to Transfer (a "**Tag-Along Sale**") to any person (other than a Permitted Transferee), in one or a series of related transactions, Class A Units or any other securities of the Company held by McAuley ("**Subject Securities**"), McAuley shall give not less than 20 days prior written notice of such intended Transfer to the Company and to the other Class A Unit holders (the "**Tag-Along Offerees**"). Such notice (the "**Tag-Along Notice**") shall set forth all material terms and conditions of such proposed Transfer, including the name of the prospective transferee, the number and type of Subject Securities proposed to be Transferred (the "**Tag-Along Securities**"), the aggregate purchase price and the per unit purchase price proposed to be paid therefor and the payment terms and type of Transfer to be effectuated, in each case, to the extent known by McAuley. Within ten (10) days following the delivery of the Tag-Along Notice by McAuley to the Tag-Along Offerees and to the Company, each Tag-Along Offeree shall, by notice in writing to the McAuley and to the Company, have the opportunity and right to sell to the purchaser (upon the same terms and conditions as McAuley, including with respect to representations, warranties, covenants and indemnities (each of which would be made severally by each such Tag-Along Offeree, based on such Tag-Along Offeree's pro rata share of the aggregate consideration to be paid by the purchaser)) the same percentage of securities of the Company held by such Tag-Along Offeree as such Transfer represents with respect to the Subject Securities proposed to be sold by McAuley. McAuley and/or each Tag-Along Offeree shall Transfer to the purchaser all of the securities proposed to be sold by them at not less than the price (subject to the last sentence of this Section 9(c)) and upon other terms and conditions, if any, not more favorable to the purchaser than those originally offered. McAuley shall not Transfer any Subject Securities to such purchaser if such purchaser declines to permit the participating Tag-Along Offerees to participate pursuant to the terms of this Section 9(c). If the Tag-Along Offerees do not hold securities that are

the same class as the Subject Securities, the purchase price to be paid for such other securities pursuant to this Section 9(c) shall be equal to the fair market value of such other securities, as the same shall be implied from the purchase price offered for the Subject Securities. Notwithstanding the foregoing, the foregoing provisions of this Section 9(c) shall not apply to any (i) Permitted Transfer or (ii) the sale of up to 200,000 Class A Units (subject to adjustment for any Class A Unit splits, combinations, recapitalizations or the like) by McAuley.

(d)     Piggyback Registration Rights.  If the Company proposes to file a registration statement under the Securities Act of 1933, as amended, with respect to an offering of its securities for its own account (other than a registration statement filed in accordance with an exchange offer or any employee benefit plan), the Class A Unit holders shall be entitled to customary piggyback registration rights with respect to such offering.

(e)     Service Agreement Put.  Within thirty (30) days following the termination for any reason of the Service Agreement, dated November __, 2011, by and between the Company and AutoTrader.com, Inc. ("AutoTrader"), the Company shall, at AutoTrader's option, repurchase all (but not less than all) of the Class A Units or other securities of the Company then held by AutoTrader (the "**Service Agreement Put**"). The purchase price for the repurchased units or other securities shall be an aggregate of $50,000. AutoTrader may exercise the Service Agreement Put by delivering written notice to the Company (the "**Put Notice**"). The Company and AutoTrader shall use their commercially reasonable efforts to consummate the repurchase within 90 days of delivery of the Put Notice provided that the Company has sufficient legally available funds to redeem such Class A Units.

## 10.     Subsequent Offerings.

(a)     Subject to applicable securities laws, each Member holding Class A Units (each, a "**Class A Member**") shall have a right of first refusal to purchase its *pro rata* share of any Equity Securities, as defined below, that the Company may, from time to time, propose to sell and issue after the date of this Agreement, other than the Equity Securities excluded by Section 10(e) below.  Each Class A Member's *pro rata* share is equal to the ratio of (i) the number of Class A Units held by such Member immediately prior to the issuance of such Equity Securities to (ii) the total number of Class A Units outstanding immediately prior to the issuance of the Equity Securities.  The term "**Equity Securities**" shall mean (1) any Class A Unit or other security of the Company, (2) any security convertible into or exercisable or exchangeable for, with or without consideration, any Class A Unit or other security (including any option to purchase such a convertible security), (3) any security carrying any warrant or right to subscribe to or purchase any Class A Unit or other security or (4) any such warrant or right.

(b)     If the Company proposes to issue any Equity Securities, it shall give each Class A Member written notice of its intention, describing the Equity Securities, the price and the terms and conditions upon which the Company proposes to issue the same. Each Class A Member shall have two (2) weeks from the receipt of such notice to agree to

purchase its *pro rata* share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the quantity of Equity Securities to be purchased. Notwithstanding the foregoing, the Company shall not be required to offer or sell such Equity Securities to any Class A Member who would cause the Company to be in violation of applicable federal securities laws by virtue of such offer or sale.

(c)     If not all of the Class A Members elect to purchase their *pro rata* share of the Equity Securities, then the Company shall promptly notify in writing the Class A Members who do so elect and shall offer such Class A Members the right to acquire such unsubscribed shares on a *pro rata* basis. The Class A Members shall have one (1) week after receipt of such notice to notify the Company of its election to purchase all or a portion thereof of the unsubscribed Equity Securities. If the Class A Members fail to exercise in full the rights set forth in this Section, the Company shall have three (3) months following the notice given pursuant to Section 10(b) to sell the Equity Securities in respect of which the Class A Members' rights were not exercised, at a price and upon general terms and conditions not more favorable to the purchasers thereof than specified in the Company's notice to the Class A Members pursuant to Section 10(b) hereof. If the Company has not sold such Equity Securities within three (3) months of the notice provided pursuant to Section 10(b), the Company shall not thereafter issue or sell any Equity Securities, without first offering such securities to the Class A Members in the manner provided above.

(d)     The rights established by this Section 10 may be waived by any Member with respect to the outstanding Class A Units held by such Member.

(e)     The rights established by this Section 10 shall have no application to any of the following Equity Securities:

(i)     Profit Units issued after the date hereof to employees, consultants or managers of the Company;

(ii)     Units issued in connection with any Unit split, Unit dividend or recapitalization by the Company;

(iii)     any Equity Securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement, or debt financing from a bank or similar financial or lending institution approved by the Managers;

(iv)     any Equity Securities issued for consideration other than cash pursuant to a merger, consolidation, acquisition, strategic alliance, licensing or other commercial transaction approved by the Managers; and

(v)     any Equity Securities that are issued by the Company pursuant to a registration statement filed under the Securities Act.

**11.     Fees and Expenses.**  All fees and expenses incurred in connection with the management and operation of the Company shall be borne by the Company, including, without limitation, legal, accounting and tax preparation and filing fees and expenses.

**12.    Maintenance of Books; Inspection Rights.**  The Board shall cause the Company to keep books and records of accounts and shall keep minutes of the proceedings of the Board and the Members.  The calendar year shall be the accounting year of the Company.  Company books and records shall be open to inspection by Members, or their authorized representatives, including accountants, at any reasonable time during normal business hours after reasonable advance notice.

**13.    Reports.**  On or before the 90th day following the end of each fiscal year or the 60th day following the end of each fiscal quarter during the term of the Company, the Board shall cause each Member to be furnished with an unaudited balance sheet, income statement and a statement of changes in the Members' capital accounts for, or as of the end of, that year or quarter, and such other returns and reports as the Company is required to provide to the Members for tax purposes.  The Board also may cause to be prepared or delivered such other reports as the Board may deem appropriate.  The Company shall bear the costs of all these reports.

**14.    Liability of Members.**

(a)    Except as otherwise required by applicable law and as explicitly set forth in this Agreement, no Member shall have any personal liability whatever in such Member's capacity as a Member, whether to the Company, to any of the Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and therefore, a Member shall be liable only to make such Member's Capital Commitment to the Company as set forth on **Exhibit A** and the other payments expressly provided herein.  No Member shall be required to restore to the Company any negative balance in such Member's capital account.  No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law or by this Agreement.  Any Member may, with the consent of the Board, make loans to the Company, and any loan by a Member to the Company shall not be considered to be a capital contribution.

(b)    In the event that any Member or any affiliate of a Member acquires knowledge of a potential transaction or matter which may be an opportunity for both the Company and the Member or affiliate as the case may be, then the Company hereby renounces to the fullest extent permitted by law any interest or expectancy in such opportunity such that (a) the Company waives any claim that such opportunity should have been presented to the Company and (b) the Member or affiliate, as the case may be, shall have no duty to communicate or present such opportunity to the Company, unless such opportunity is offered to such Member or affiliate in writing and the writing states that such opportunity is offered solely in, and as a direct result of, his or her capacity as a Member of the Company or affiliate thereof.  To the fullest extent permitted by the laws of the State of Michigan, such person shall not be liable to the Company or its Members for breach of any duty as a Member of the Company solely by reason of the fact that the Member or affiliate pursues or acquires such opportunity for itself or himself, or offers or directs such opportunity to another person.  In addition to and notwithstanding the

foregoing provisions, an opportunity shall not be deemed to be a potential opportunity for the Company if it is a business opportunity that the Company is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Company's business or is of no practical advantage to it or that is one in which the Company has no interest or reasonable expectancy.

15.    **Exculpation.**  Each Manager and each officer of the Company shall not be liable to any Member, Manager or officer of the Company for any conduct or actions, except for conduct or actions adjudged not to have been undertaken in good faith or to constitute recklessness, willful misconduct, gross negligence, a knowing violation of law or an intentional material breach of this Agreement.  The Board and officers of the Company may consult with counsel and accountants respecting Company affairs and shall be fully protected and justified in acting in accordance with the advice of counsel or accountants, provided they have been selected with reasonable care.

16.    **Indemnification.**  The Company shall indemnify, out of the assets of the Company only, each Manager and each officer of the Company, and their respective agents, to the fullest extent permitted by law and shall save and hold them harmless from and in respect of all (a) reasonable fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, or demand against the Company, the Members, the Board, the officers of the Company, or their respective agents that arise out of or in any way relate to the Company, the Company's properties, business or affairs and (b) such claims, actions, and demands and any losses or damages resulting from such claims, actions and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Company) of any such claim, action or demand; provided, however, that this indemnity shall not extend to conduct not undertaken in good faith nor to any conduct that constitutes recklessness, willful misconduct, gross negligence, a knowing violation of law or an intentional material breach of this Agreement.  Expenses incurred by any indemnified person in defending a claim or proceeding covered by this Section 16 shall be paid by the Company in advance of the final disposition of such claim or proceeding provided the indemnified person undertakes to repay such amount if it is ultimately determined that such person was not entitled to be indemnified.  The provisions of this Section shall remain in effect as to each indemnified person whether or not such indemnified person continues to serve in the capacity that entitled such person to be indemnified.

17.    **Liquidation.**  Upon termination, the Company shall be dissolved and wound-up.  The Board shall proceed with the orderly sale or liquidation of the assets of the Company and shall apply and distribute the proceeds of such sale or liquidation in the following order of priority, unless otherwise required by law: (a) first, to pay all expenses of liquidation; (b) second, to pay all creditors of the Company in the order of priority provided by law or otherwise; (c) third, to the establishment of any reserve that the Board may deem necessary (such reserve may be paid over to an escrow agent); and (d) fourth, to the Members pursuant to Section 8(b) above.  A reasonable amount of time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of

liabilities to creditors so as to enable the Board to minimize the losses attendant upon such liquidation.

18.  **Confidentiality**.  Each Member agrees that such Member will maintain the confidentiality of information that is non-public information furnished by the Board and the Company to such Member (including information regarding any entity in which the Members or affiliates of the Company hold, or contemplate acquiring, any interest) in accordance with such procedures as it applies generally to information of this kind (including procedures relating to information sharing with affiliates of the Company or each Member), except (a) as otherwise required by governmental regulatory agencies (including tax authorities in connection with an audit or similar examination of such Member), self-regulating bodies, law, legal process, or litigation in which such Member is a defendant or plaintiff or (b) to representatives and advisors of such Member or such Member's affiliates who need to know the information and who are informed of the confidential nature of the information.

19.  **Representations of Members**.  Each Member hereby represents and warrants as of the date hereof to, and acknowledges to, the Company and the other Members that (a) such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (b) such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (c) such Member is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (d) such Member understands that the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (e) such Member is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act; (f) such Member has the full power and authority to enter into this Agreement and to conclude the transactions described herein; (g) the execution, delivery and performance of this Agreement do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or any agreement or instrument to which such Member is a party or by which such Member is bound; (h) this Agreement constitutes the legal, valid and binding obligation of such Member, enforceable in accordance with its terms; (i) if such Member is an entity, such Member is duly formed or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby; (j) if such Member is an entity, such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder; or (k) if such Member is an entity, neither such Member nor any of its affiliates is, nor will the Company as a result of such Member holding Units be, an "investment company" as

defined in. or subject to regulation under, the Investment Company Act of 1940 or a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company," as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935. The Company represents and warrants to the Members that, assuming the accuracy of the representations and warranties of the Members contained in this Section 19, the offer, issuance, and sale of the Units is exempt from the registration and prospectus delivery requirements of the Securities Act, and it has been registered or qualified (or is exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

20.   **Amendments.**   The terms and provisions of this Agreement may be modified or amended at any time and from time-to-time by the vote or written consent of the Board and Members holding at least a majority of the outstanding Class A Units; provided that any amendment that adversely affects a particular Class A Member in a manner different than all other Class A Members shall be specifically approved by such adversely affected Class A Member. Notwithstanding the foregoing, the Board may update **Exhibit A** to this Agreement pursuant to Section 4(c).

21.   **Notices.**   Any notice or other communication that the Company or a Member desires to give to another shall be in writing, and shall be deemed effectively given (a) upon personal delivery or three days after deposit in any United States mail box, by registered or certified mail, postage prepaid. (b) upon confirmed transmission by facsimile, (c) upon confirmed delivery by e-mail or (d) upon confirmed delivery by overnight commercial courier service, addressed to the Company at 3722 High Grove Way, Lake Onion, Michigan 48360, attn Steven J. McAuley, smcauley@controlbox.com (or at such other address as the Company may designate by fifteen days' advance written notice to the Members) or addressed to any other recipient at the address maintained by the Company (or at such other address as a Member may designate by fifteen days' advance written notice to the Company).

22.   **Power of Attorney.**   By signing this Agreement, each Member designates and appoints each Manager as such Member's true and lawful attorney, in such Member's name, place and stead to make, execute, sign and file the Company's Articles of Organization and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the state of the Company's formation, or any other state or jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such states or jurisdictions.

23.   **Other Instruments and Acts.**   The Members agree to execute any other instruments or perform any other acts that are or may reasonably be necessary to effectuate and carry on the limited liability company created by this Agreement.

24.   **Waiver.**   No consent or waiver, express or implied, by any party of any breach or default by any other party in the performance of such other party's obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach

or default in the performance by such party of the same or any other obligations of such party hereunder.  Failure on the part of any party to complain of any act or failure to act of another party or to declare another party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of such party's rights hereunder.

     **25.**    **Miscellaneous**.  This Agreement constitutes the full, complete, and final agreement of the Members and supersedes all prior and contemporaneous agreements between the Members with respect to the Company and shall be binding upon the heirs, personal representatives and other successors of each of the Members.  This Agreement shall be construed in accordance with the internal laws of the State of Michigan, without reference to such state's conflicts of law principles.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

[REMAINDER INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement as of the date first above written.

CONTROLBOX.COM, LLC

By:_____

Name:    STEVEN MCAULEY

Title:    CEO

MEMBERS:

Steven J. McAuley

By:_____

Name:    STEVEN MCAULEY

Title:

Tech 3.0 Solutions Inc.

By:_____

Name:

Title:

AutoTrader.com, Inc.

By:_____

Name:

Title:

[Signature Page to ControlBox.com, LLC Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement as of the date first above written.

CONTROLBOX.COM, LLC

By:_____
Name:
Title:

MEMBERS:

Steven J. McAuley

By:_____
Name:
Title:

Tech 3.0 Solutions Inc.

By:_____*JOSEPH COHEN*_____
Name:
Title:_____*PRESIDENT*_____

AutoTrader.com, Inc.

By:_____
Name:
Title:

[Signature Page to ControlBox.com, LLC Operating Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement as of the date first above written.

CONTROLBOX.COM, LLC

By:_____
Name:
Title:

MEMBERS:

Steven J. McAuley

By:_____
Name:
Title:

Tech 3.0 Solutions Inc.

By:_____
Name:
Title:

AutoTrader.com, Inc.

By:_____
Name: /STEVE GREENFIELD
Title: VP BUSINESS DEVELOPMENT
JAN 29, 2012

[Signature Page to ControlBox.com, LLC Operating Agreement]

# EXHIBIT A
## ControlBox.com, LLC

| Name & Address | Capital Commitment | Class A Units | Profit Units |
|---|---|---|---|
| Steven J. McAuley<br>3722 High Grove Way<br>Lake Onion, Michigan 48360<br>E-Mail: smcauley@controlbox.com | $315,290 | 1,900,000 | |
| Tech 3.0 Solutions, Inc.<br>C/O Joseph Cohen<br>5335 Teesdale Ave<br>Valley Village, CA 91607<br>E-Mail: _____ | $0 | 50,000 | |
| AutoTrader.com, Inc.<br>6205 Peachtree Dunwoody Road<br>Atlanta, Georgia 30328<br>Attn: Charles Bowen<br>E-Mail: Charles.Bowen@coxinc.com | $50,000 | 50,000 | |
| Profit Units Pool** | | | 220,000 |
| **Total** | $415,290 | 2,000,00 | |

** Unallocated

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING SUCH SECURITIES OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT.

**EXHIBIT B**
**CONTROLBOX.COM, LLC**
**COUNTERPART SIGNATURE PAGE AND**
**AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges and agrees, as follows:

1.      **Acknowledgment.** The undersigned hereby acknowledges that the undersigned's execution of this Counterpart Signature Page and Agreement to be Bound to the ControlBox.com, LLC Operating Agreement, dated November __, 2011, as may be amended from time to time (the "**Operating Agreement**") is a condition precedent to the undersigned's receipt of membership interest units ("**Units**") of ControlBox.com, LLC (the "**Company**"). The undersigned hereby acknowledges that the undersigned has read a copy of the Operating Agreement by and among the Company and the other parties named therein.

2.      **Counterpart Signature Pages.** The undersigned hereby acknowledges and agrees that the undersigned's signature below shall constitute an executed counterpart signature page to the Operating Agreement.

3.      **Operating Agreement.** The undersigned hereby agrees to be bound by and subject to the terms and conditions of the Operating Agreement as a "Member" thereunder.

Dated: _01 / 09 / 12_

**CONTROLBOX.COM, LLC**

By: _____

Name:  STEVEN MCAULEY

Title:  CEO

Dated: _01 / 09 / 12_

**MEMBER:**

Name of Entity (if necessary):

_____

By: _____

Name:  STEVEN MCAULEY

Title (if necessary):

**EXHIBIT B**
**CONTROLBOX.COM, LLC**
**COUNTERPART SIGNATURE PAGE AND**
**AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges and agrees, as follows:

1.      **Acknowledgment.**  The undersigned hereby acknowledges that the undersigned's execution of this Counterpart Signature Page and Agreement to be Bound to the ControlBox.com, LLC Operating Agreement, dated November 27, 2012 as may be amended from time to time (the "**Operating Agreement**") is a condition precedent to the undersigned's receipt of membership interest units ("**Units**") of ControlBox.com, LLC (the "**Company**").  The undersigned hereby acknowledges that the undersigned has read a copy of the Operating Agreement by and among the Company and the other parties named therein.

2.      **Counterpart Signature Pages.**   The undersigned hereby acknowledges and agrees that the undersigned's signature below shall constitute an executed counterpart signature page to the Operating Agreement.

3.      **Operating Agreement.**   The undersigned hereby agrees to be bound by and subject to the terms and conditions of the Operating Agreement as a "Member" thereunder.

Dated:_____          **CONTROLBOX.COM, LLC**

By:_____
Name:
Title:

Dated: _Jan 29 2012_          **MEMBER:**

Name of Entity (if necessary):

_Altstraded.com, Inc_

By: _____
Name: _Steve Greenfield_
Title (if necessary): _VP Business Development_