**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF MICHIGAN**

Controlbox.com, LLC,                                  Case no. 14-11069

     Plaintiff,                                        Judge Laurie J. Michelson

vs.                                                   Magistrate Judge R. Steven Whalen

MICHAEL NICHOLS, et. al.,

     Defendants,

vs.

STEVEN J. MCAULEY, JOSEPH COHEN, AND MC

INVESTMENTS OF MICHIGAN, INC.,

     Third Party Defendants

---

Michael Nichols (pro se)
mike@nixco.net
4303 McPherson Avenue
Saint Louis, MO 63108
Telephone: 314-323-5459

---

**DEFENDANTS FIRST AMENDED THIRD PARTY COMPLAINT**

Defendant Michael Nichols ("Nichols"), by way of Third Party Complaint against Third

Party Defendants Steven J. McAuley ("McAuley"), Joseph Cohen ("Cohen"), and MC

Investments of Michigan, Inc. ("MC Investments"), states, upon information and belief:

1

### A. Parties

1. Third Party Defendant Joseph Cohen ("Cohen") is a businessman with his address at 5335 Teesdale Avenue, Valley Village, CA 91607.

2. Third Party Defendant Steven J. McAuley ("McAuley") is a businessman with his address at 263 Columbia Street, Vancouver, B.C., Canada.

3. Third Party Defendant MC Investments, Inc. ("MC Investments") is a Michigan close corporation with its registered address at 3772 High Grove Way, Lake Orion, MI 48680.

4. At all times relevant to this complaint, the tortious and unlawful activities of all Third Party Defendants were conspired and committed for the purpose of converting Nichols' work product and intellectual property to their own to be held under the ownership of the Plaintiff Controlbox.com, LLC ("Controlbox.com" or "Controlbox"), which was organized as a Michigan Domestic Limited Liability Corporation to be governed by the laws of the State of Michigan.  Therefore, jurisdiction in these Third Party Complaints is properly laid in the Sixth U. S. District Court, Eastern District of Michigan.

### B. General Allegations

5. In early 2009, Nichols was hired by Automotive Product Consultants ("APC") in Chesterfield, Missouri specifically for the purposes of conducting a pilot program of a suite of services and technology products marketed as "Mota Valet" in conjunction with a technology company known as Mota Motors, Inc. ("Mota") of Venice, California.

2

6.  The pilot program required Nichols to personally speak to hundreds of private consumers whom were in the process of selling their cars to, or buying cars from, other private consumers on the Internet.

7.  In the Spring of 2009, while working for APC, Nichols began documenting his vision of a communications tool called "MotaWorks" for Mota shortly before submitting his first proposal outlining the concept to Mota's executive team, including McAuley whom held the title of "Chief Automotive Officer" at Mota.

8.  At the core of MotaWorks was a communications management tool that would allow for the handling of phone calls and emails securely and without exposing personal email addresses and phone numbers on the Internet.

9.  In April of 2009, Nichols created a "Playbook" for Mota Valet which optimized the product and service offerings for the current Mota Valet products.

10. In late May 2009, McAuley negotiated a consulting contract for Nichols with Mota, which Nichols signed on May 29th, 2009 while concurrently terminating his employment with APC.

11. At all times subsequent to this and during the course of his contract with Mota, Nichols reported directly to McAuley.

12. Immediately after the commencement of this contract, McAuley tasked Nichols with creating a "Playbook", similar to the one Nichols had created for Mota Valet, that would envision a reworked version of the technology and products previously marketed as "Mota Valet" as an enhanced product offering for the automotive

3

classified advertising company Autotrader.com, to assist McAuley and Mota's executive team in creating a partnership with Autotrader.com.

13. From this Playbook that was created by Nichols and evolved over the following year with the input of Mota and Autotrader.com personnel such as Joe George, Stephanie Straeter, Patrice Mantovanni, Alex Hudmon, Rod Bownds, and others; the earliest version of the service offering now known as "Autotrader.com VIP" ("VIP") was born.

14. McAuley specifically instructed Nichols to structure the section of the Playbook regarding call handling to specify that "inbound buyer" telephone calls would be handled by a call center partner called DME Automotive ("DME") of Daytona, Florida; with whom McAuley had entered into partnership discussions at his own initiative.  "Inbound buyer" telephone calls were those placed by prospective buyers to inquire about an ad on Autotrader.com, during which the buyer would reasonably expect the seller to answer the phone.

15. In June of 2009, Nichols again proposed a further-evolved vision of MotaWorks to the Mota executive team, citing the need for technology to replace human call center agents in order to nullify the apprehension buyers had expressed when their calls were answered by an unrelated third party; and to expedite the due diligence process between private party buyers and sellers.

16. At no time and in no manner prior to the Fall of 2010 did any of Mota's executive or product management teams express an interest in discussing or pursuing any of the concepts presented in Nichols' MotaWorks proposal, or any other technology

4

that would enable or manage communications directly between buyers and sellers without the use of a third party call center.

17. Absent any interest from Mota, and secure in the knowledge that the key to preventing fraud and unwanted contact between private parties lie in the development of such communications technology as he was envisioning, Nichols began devising a business plan for a product he called FSBOSafe.com (where "FSBO" is a relatively common acronym meaning "For Sale By Owner").

18. As Director of Operations at Mota, Nichols also became Mota's overseer of the day-to-day activities of all external partners including onsite vehicle inspections and photography performed by Datascan Field Services ("DFS"), Autotrader.com call center sales and support for VIP, and DME.

19. On or around July 29th, 2009, Nichols and McAuley met in Daytona, Florida for the purposes of "kicking off" the DME call center partnership for VIP the following day.

20. That evening, while McAuley and Nichols dined in the restaurant at their hotel near Daytona, Nichols introduced McAuley to his business idea for FSBOSafe.com by way of a printed copy of its executive summary.

21. Nichols stated to McAuley that if Mota had no intention of pursuing the development of MotaWorks or similar communications tools, then Nichols planned to establish FSBOSafe.com as a business concurrent to his work for Mota. Nichols also expressed his desire to obtain an agreement whereby Mota might become the first customer of FSBOSafe.com, ideally at zero cost to Mota.

22. After dinner, and after McAuley finished reading the document in Nichols' room, McAuley informed Nichols that Mota had neither the cash nor the development capacity to pursue such technology.

23. Also at that time, McAuley claimed to have the investor connections and expertise to quickly raise money to launch Nichols' business idea, and suggested that Nichols partner with McAuley as co-founders.

24. Nichols agreed to partner with McAuley under a de facto partnership whereby both men would possess equal ownership of the business on the condition that McAuley cover any incidental expenses incurred prior to receiving investment.

25. Also under this agreement, McAuley would serve as the Chief Executive Officer ("CEO") and Nichols would serve as the President.  McAuley's duties were to include all aspects of administration of the business including fundraising, finances, and organization; leaving Nichols to focus on the product.

26. At the conclusion of the meeting, both men agreed that the business needed a better name and thus both should collaboratively consider alternatives, and McAuley agreed to create pro forma financial projections for the entity.

27. Also at the conclusion of this meeting, McAuley instructed Nichols not to mention the business to anyone at Mota and to allow McAuley to determine the appropriate time to make such disclosure to executives at Mota.

28. McAuley provided a draft of pro forma financial projections for FSBOSafe.com to Nichols on or around August 21st, 2009.

29. At all times subsequent to the Daytona meeting described herein and through January 10th, 2011, Nichols honored a fiduciary duty to protect McAuley's interests under this de facto partnership.

30. At all times subsequent to the Daytona meeting described herein and through January 10th, 2011, Nichols believed McAuley's explicit statements and conduct to be expressly binding McAuley to a fiduciary duty to protect the interests of Nichols under this de facto partnership as well.

31. At no time subsequent to the Daytona meeting described herein and through January 10th, 2011 did McAuley notify Nichols that he intended to terminate this de facto partnership and unilaterally reassign all of its assets, rights, and authorities to another entity of his sole ownership that would be considered wholly separate from the de facto partnership.

32. After discussing several alternatives for the name of the company, McAuley and Nichols agreed upon the name "Controlbox.com" in October of 2009.  From this point forward, the de facto partnership that had been established at the meeting in Daytona was known as "Controlbox.com".

33. Despite Nichols' repeated requests, at no time during the eleven-month period between October of 2009 and September of 2010 did McAuley attempt to properly organize Controlbox.com and officially memorialize their partnership and equity using a legal corporate structure.

34. In the fall of 2009, McAuley disclosed Controlbox.com as his own invention to executives at Mota while attempting to conceal Nichols' involvement as creator.

7

35. McAuley also concealed his disclosure from Nichols.

36. Also during the time between October of 2009 and January of 2011, McAuley personally published many public and private statements identifying Nichols as "creator" and "co-founder" of Controlbox.com.

37. On February 4th, 2010, McAuley and Nichols publicly presented Controlbox.com as co-founders to a public audience at the Vator Splash event held at the Cafe Du Nord in San Francisco, California.

38. In the spring of 2010, McAuley introduced Nichols to Joseph Cohen as a prospective candidate for Controlbox.com's Chief Technology Officer.  Nichols agreed Cohen was imminently qualified and should be engaged if possible.

39. Subsequent to Controlbox.com's engagement of Cohen, Nichols delivered specifications to Cohen to build two simple presentation tools that would assist McAuley in presenting Controlbox.com.

40. One of these tools was an interactive presentation using a technology called Flash which demonstrated a sample user experience for different types of telephone interactions handled by the proposed Controlbox.com technology.

41. The other tool demonstrated how a telephone call could be initiated between two parties using a web application.

42. At no time prior to October 2010 did Cohen develop any technology other than demonstration tools, none of which could be construed as "proof of concept" that a feasible business could be built using the business model McAuley was presenting as that of Controlbox.com.

8

43. Included in those demonstration tools were voice recordings made by professional voice talent Jill Tarnoff which were paid for by Nichols.

44. In the Fall of 2010, McAuley and Nichols attended a meeting with Melanie Kovach, General Manager of Private Party at Autotrader.com ("Kovach").  The purpose of this meeting was to further discuss a pilot agreement between Autotrader.com and Controlbox.com.

45. Prior to this meeting, McAuley informed Nichols that he had requested of Kovach to keep the Controlbox.com discussion private and not to discuss the business of Controlbox.com with any personnel at Mota.

46. Upon information and belief, Kovach complied with McAuley's request.

47. On September 15th, 2010, McAuley's company "MC Investments of Michigan, Inc." registered Articles of Organization with the State of Michigan naming McAuley as the registered agent of "Controlbox.com, LLC".  These Articles of Organization were subsequently recorded by the State of Michigan on September 20th, 2010.

48. Also on September 15th, 2010, McAuley stated to Nichols that the prolonged period under which McAuley had been unable to secure funding had resulted in an unforeseen scope of expenses, and that McAuley believed himself to be deserving of a larger portion of equity than his agreed upon 50%.

49. Nichols agreed in principle to negotiate a portion of equity based upon an agreeable pre-investment valuation, provided that McAuley first provide an accounting of the funds McAuley had spent to date.

9

50. At no time subsequent to this conversation did McAuley attempt to provide such an accounting of funds to Nichols.

51. Also on September 15th, 2010, and with Nichols in attendance, McAuley presented Controlbox.com, LLC to a public audience of 26 at Oakland University in Michigan.

52. In the course of this presentation, McAuley identified Nichols as a co-founder and member of Controlbox.com, LLC.

53. Despite Nichols' repeated requests, at no time subsequent to filing of the Articles of Organization on September 15th, 2010 did McAuley attempt to create a proper operating agreement and memorialize the members and their respective equity prior to January 11th, 2011.

54. In October of 2010, McAuley and Kovach executed a pilot agreement between Autotrader.com and Controlbox.com, LLC.

55. At no time prior to the execution or funding of this agreement did Autotrader.com, its agents or employees, attempt to ensure that Controlbox.com, LLC was a properly organized company with full authority to execute this pilot agreement.

56. At no time prior to the execution or funding of this agreement did Autotrader.com, by its agents or employees, attempt to ensure that Controlbox.com, LLC was in compliance with applicable labor and intellectual property laws.

57. Following the execution of the pilot agreement and under the belief that McAuley's statements and conduct had guaranteed Nichols' position as a 50% owner of Controlbox.com, LLC; Nichols continued to deliver plans, instructions, scripts, and other guidance for Cohen to use in developing the Controlbox.com

products, with Nichols making modifications based upon the particular needs
expressed in meetings with Autotrader.com, through the end of 2010 and into
January of 2011.

58. At no time prior to January 11th, 2011, did McAuley assert in any way that Nichols
had forfeited his right to equity in the company that he had envisioned in the
spring of 2009 and for whom he been working without compensation ever since.

59. At no time prior to January 11th, 2011, did McAuley deliver to Cohen any of his own
original written specifications or instructions to use in developing the
Controlbox.com consumer products.

60. On December 2nd, 2010, following the execution of the pilot agreement,
Autotrader.com issued check number 189154 payable to Controlbox.com, LLC
remitted to McAuley's home address at 3772 High Grove Way, Lake Orion, Michigan
in the amount of $40,000.

61. Subsequent to McAuley receiving these funds, McAuley commissioned Cohen to
begin building the first Controlbox.com consumer products based upon Nichols'
instructions.

62. Also subsequent to the receipt of these funds, Cohen explicitly requested that
Nichols finish his specifications and instructions, and deliver them to Cohen as
quickly as possible.

63. On January 8th, 2011, a Term Sheet was delivered to McAuley by Detroit Venture
Partners ("DVP") for a proposed $750,000 investment in Controlbox.com.  This

term sheet was the product of several months' discussion and named both McAuley and Nichols as co-founders.

64. Three days later, on January 11th, 2011, McAuley attempted to coerce Nichols into a verbal agreement forfeiting the 50% equity Nichols believed himself to be entitled in exchange for some unspecified amount of equity that McAuley would unilaterally determine later; or else McAuley would simply exclude Nichols from the company and proceed without him.

65. Nichols refused to comply with McAuley's coercion.

66. On or about January 11th, 2011, both McAuley and Cohen promptly ceased all direct communication with Nichols, ignored his calls and emails, and revoked his access to the "mnichols@controlbox.com" email account.  Neither have communicated with Nichols at any time since without the presence of counsel.

67. Subsequent to his failed attempt at coercing Nichols to act against his own interests, McAuley made accusations to DVP that Nichols had begun making unreasonable demands for equity and salary.

68. Upon information and belief, McAuley made similar statements to Cohen and employees of Autotrader.com.

69. At no time has McAuley supported his hearsay accounting of Nichols' statements with any factual, or even circumstantial, evidence that Nichols made unreasonable demands for salary and equity.

70. Subsequent to January 11th, 2011 and under McAuley's specific instruction, Cohen did falsely and intentionally remove all mention of Nichols from product documentation and other materials.

71. Subsequent to January 11th, 2011 and under McAuley's specific instruction, Cohen did falsely and intentionally corroborate a false account of the founding of Controlbox.com, LLC which omitted Nichols as creator and co-founder.

72. Subsequent to January 11th, 2011 and under McAuley's specific instruction, Cohen did falsely and intentionally make changes to the Controlbox.com products so they might vary enough from Nichols' original plans to support the false account omitting Nichols' involvement as creator and co-founder.

73. Along with the development of Controlbox.com products, McAuley used the $40,000 in funds that Controlbox.com, LLC received from Autotrader.com to compensate Cohen for both the development of the Controlbox.com and Cohen's assistance in concealing McAuley's tortious and criminal conduct.

74. Subsequent to these events, McAuley awarded Cohen equity in Controlbox.com, LLC to be held under Cohen's company, "Tech 3.0 Solutions, LLC".

75. On February 14th, 2011; in an attempt to salvage the DVP investment, McAuley and his attorney John Nitz invited Nichols and his attorney David Groce to a conference call.

76. On this call, McAuley apologized for his actions and agreed to negotiate terms on the basis of their prior equal partnership, providing a valuation-based adjustment of McAuley's share once McAuley provided an accounting of his expenses incurred.

13

This agreement was identical to the one Nichols had proposed the previous September.

77. On February 17th, 2011, Groce drafted a term sheet documenting these good faith agreements and forwarded it to Nitz for review by Nitz and McAuley.

78. McAuley then informed Nitz he was declining to follow through with his agreement to negotiate with Nichols, which Nitz then communicated to Groce.

79. At no time and in no manner have any of the Third Party Defendants compensated the Third Party Plaintiff for his ideas and work product fraudulently obtained by Controlbox.com, LLC between Nichols' conception of the business idea in 2009 and McAuley's exclusion of Nichols in January 2011.

80. Because of the explicit actions and statements of McAuley prior to January 11th, 2011, and at all times relevant to the Plaintiff's Complaint, Nichols believed any and all statements made to Detroit Venture Partners, Fraser McCombs, and all other parties to be truthful and accurate.

81. Because of the explicitly fraudulent omissions committed and/or funded by all Third Party Defendants since January 11th, 2011, and at all times relevant to the Plaintiff's Complaint, Nichols believed the publication of his true and accurate statements to be critically necessary to justly defend his accomplishments and his character.

82. On February 21st, 2012, Nichols was contacted by Zach Freed of Fraser McCombs Capital to initiate discussions regarding a potential investment in Rollsale, which Nichols had co-founded later in 2011.

14

83. During the course of these discussions, the credibility of an item on Nichols' resumé was challenged: his role as founder of Controlbox.com.

84. Nichols supported his resumé with true and factual evidence for the necessary purpose of preserving his credibility with potential investors and avoiding a potential conflict of interest for Fraser McCombs that would be created if McAuley continued to force Nichols to litigate for his rights in Controlbox.com.

85. Weeks later, Nichols found out that Fraser McCombs had been preparing to close on an investment in Controlbox.com, LLC at that time.

86. McAuley and Cohen absconded Controlbox.com, LLC from Michigan to Canada.

87. The flight of Controlbox.com, LLC across international borders was a measure taken by Cohen and McAuley to continue their unlawful fundraising in a new name while avoiding criminal and civil penalties after being caught red-handed by Fraser McCombs in their intentional fraud of omission, plus the many other willful omissions McAuley and Cohen had previously published in solicitations to investors sent via computer networks, United States Postal Service, and other interstate communications.

88. Shortly thereafter, Controlbox.com's website was no longer publicly accessible.

89. Without any public announcement of a change in the business entity previously known as Controlbox.com, LLC; in 2013 an identical business called "Privatis Technology Corporation" ("Privatis") appeared in Vancouver, British Columbia, Canada.

15

90. On its website, Privatis presents both McAuley and Cohen in the sames roles they held in Controlbox.com, LLC and delivering the same product for Autotrader.com. On no page on this website is Controlbox.com, LLC mentioned.

91. Between the time McAuley and Cohen absconded the company from Michigan and their reemergence in Canada as Privatis in July 2013; Controlbox.com, LLC and McAuley remained unreachable by service of process.

**Count I - Breach of Fiduciary Duty**

92. Third Party Plaintiff reaffirms, realleges, and incorporates all answers and allegations as set forth herein.

93. At all times and in all conduct alleged herein, Third Party Defendants did take, assist, and/or fund tortious and/or criminal acts on behalf of themselves and for the benefit of all other Third Party Defendants.

94. McAuley failed to properly form Controlbox.com as a legal entity for eleven months after the de facto partnership began identifying itself as Controlbox.com, then subsequently delayed the drafting of an operating agreement for another four months until Controlbox.com, LLC received an offer of investment that required such an agreement to be in force.

95. This willful breach of fiduciary duty was a calculated measure designed to avail McAuley of the time and opportunity to concoct a scheme which would allow him to convert all or part of the previously agreed 50% share owned by Nichols into his own prior to creating an irreversibly enforceable agreement.

96. At all times prior to January 11th, 2011, McAuley knew explicitly of Nichols' belief that his 50% ownership in the de facto partnership "Controlbox.com" had resulted in an equal equity stake in "Controlbox.com, LLC" which had been formed by McAuley in September of 2010.

97. At no time after the formation of Controlbox.com, LLC in September of 2010 and prior to January 11th, 2011 did McAuley inform Nichols that Nichols' rights had been altered by the formation or that McAuley no longer owed a fiduciary duty to Nichols.

98. McAuley provided proof of the willful nature of his breach on January 11th, 2011 by his attempted extortion of Nichols' agreement to accept less than his entitled amount of equity under threat of being excluded from the company.

99. McAuley provided further evidence of the willful nature of his breach by his history of conflicting statements regarding Nichols' status as creator and co-founder of Controlbox.com.

100.    On January 11th, 2011, and at all times since, under the veil of Controlbox.com, LLC and its successor Privatis, McAuley and Cohen have unlawfully retained ownership of all rights of the ideas, work product, and other assets Nichols had performed and produced in good faith under the de facto partnership known as Controlbox.com and under Controlbox.com, LLC with the expectation of 50% equity.

101.    Third Party Plaintiff is entitled to compensatory and exemplary damages and other losses.

**Count II – Conspiracy**

102.   Third Party Plaintiff reaffirms, realleges, and incorporates all answers and allegations as set forth herein.

103.   At all times and in all conduct alleged herein, Third Party Defendants did take, assist, and/or fund tortious and/or criminal actions on behalf of themselves and for the benefit of all other Third Party Defendants.

104.   In late 2010, Cohen informed McAuley that once Nichols had documented his specifications for the Controlbox.com products, that Nichols' participation would no longer be necessary to the success of Controlbox.com, LLC.

105.   After successfully convincing Autotrader.com to provide a $40,000 advance without a written operating agreement in place, McAuley and Cohen conspired to convert all or part of Nichols' entitled 50% equity into their own.

106.   The first element of this conspiracy was to conceal Nichols' status as creator of Controlbox.com from Autotrader.com and Mota, to which McAuley had already been pledged the discretion of Nichols himself as well as Autotrader.com personnel.

107.   The next element in the conspiracy contrived by Cohen and McAuley and funded by Autotrader.com; was to compel Nichols to provide his complete set of diagrams, instructions, scripts, and other specifications for building the Controlbox.com products.

108.   Subsequent to this, McAuley and Cohen would make false statements to preemptively damage the credibility of Nichols in the eyes of investors, executives

18

at Mota and Autotrader.com, and other individuals. These statements would assert, among other things, that Nichols was prone to irrationality and had a tendency to make statements that should be disregarded as ungrounded.

109.    McAuley and Cohen would construct a story which omitted Nichols as a creator and co-founder as had previously been published by McAuley many times; and attributed the genesis of Controlbox.com to McAuley alone in willful misrepresentations that would be later published to investors, customers, the media, and the general public.

110.    Cohen and McAuley would remove all reference to Nichols from product documentation and make minor changes to existing product documentation for the purposes of fabricating evidence that would support the fiction that Nichols had never been involved with Controlbox.com in the capacities of creator and co-founder.

111.    Finally, once all of Nichols' ideas and work product had been documented and delivered to Cohen, McAuley would coerce Nichols to act against his own interests and agree to accept a slight fraction of the equity that Nichols was entitled; under threat of being excluded from the company without any compensation for his ideas and work.

112.    McAuley and Cohen believed that Nichols would agree to such coercion under duress, and thus neatly cover up their frauds with an executed and enforceable equity agreement.

113.    As a contingency in the event Nichols refused to submit to McAuley's coercion, McAuley and Cohen agreed to promptly cease all communications with the Nichols, shut down his "mnichols@controlbox.com" email address and take other steps to ensure that any claims Nichols might make would be disregarded as the ravings of a disgruntled and irrational former employee.

114.    McAuley and Cohen believed this plan to be sufficiently thorough to allow them to execute their unlawful acts without fear of civil or criminal penalties.

115.    Shortly after receiving the $40,000 advance from Autotrader.com, Cohen explicitly requested in December 2010 that Nichols complete and forward the remainder of his instructions, scripts, and specifications to Cohen as quickly as possible.

116.    On January 11th, 2011, in Los Angeles, California; McAuley attempted to extort an agreement from Nichols exactly as described in Allegation #109.

117.    Immediately after Nichols refused to be coerced by McAuley, both Cohen and McAuley ceased all communications with Nichols and excluded him from the joint product development activity that was already underway between Autotrader.com and Controlbox.com, LLC.

118.    All tortious and unlawful conduct alleged herein was funded by Autotrader.com and carried out by Cohen and McAuley on behalf of themselves and all Third Party Defendants.

119.    Third Party Plaintiff is entitled to compensatory and exemplary damages and other losses.

**Count III - Conversion**

120.    Third Party Plaintiff reaffirms, realleges, and incorporates all answers and allegations as set forth herein.

121.    At all times and in all conduct alleged herein, Third Party Defendants did commit, assist, and/or fund tortious and criminal action on behalf of themselves and for the benefit of all other Third Party Defendants.

122.    McAuley's statements and visible conduct were performed in accordance with the agreements set forth in the first meeting with Nichols in Daytona in 2009 to create the intentional effect of leading Nichols to believe, as Nichols still believes, that he remained a rightful 50% owner of the Controlbox.com, LLC, for whose benefit his work was being performed at all times relevant to the Plaintiff's Complaint.

123.    McAuley and Cohen both were aware of Nichols' belief.

124.    Prior to January 11th, 2011, McAuley made no statements to Nichols that would refute this belief.

125.    Prior to January 11th, 2011, Cohen made no statements to Nichols that would refute this belief.

126.    At all times prior to January 11th, 2011, Cohen and McAuley actively and explicitly solicited the ideas and work product of Nichols.

127.     At all times prior to January 11th, 2011, Cohen and McAuley did intend to convert the ideas and work product into inherently valuable technology that would be assets of Controlbox.com, LLC.

128.     At all times subsequent to September 15th, 2010, and through their statements and conduct, McAuley and Cohen intentionally misled Nichols into believing that his work and ideas would result in Nichols agreed-upon 50% equity ownership of Controlbox.com.

129.     Only upon McAuley's attempted extortion on January 11th, 2011, was Nichols given implicit notice that McAuley and Cohen planned to unlawfully convert Nichols' ideas and work product into their own property via an as-yet-undrafted operating agreement for Controlbox.com, LLC which would exclude Nichols.

130.     At no time did any Third Party Defendants inform Nichols that agreements under the de facto Controlbox.com had been terminated and that the subsequent entity named Controlbox.com, LLC would be assuming all rights of ownership of the previously developed ideas, technology, and work product of Nichols for Controlbox.com; nor did any Third Party Defendants inform Nichols that the new Controlbox.com, LLC would not be honoring the agreements that had been executed in good faith under Controlbox.com.

131.     At all times relevant in this Complaint and by their funding or execution of intentionally deceptive acts of specific omission, failure to create an operating agreement, and others; Third Party Defendants willfully deceived Third Party Plaintiff into acting against his own interests by delivering his original ideas and

work product without compensation, which Third Party Defendants then converted into the property of Controlbox.com, LLC.

132.    All tortious and unlawful conduct alleged herein was carried out by all Third Party Defendants on behalf of themselves and all other Third Party Defendants.

133.    Third Party Plaintiff is entitled to compensatory and exemplary damages and other losses.


**F. Count IV - Injurious Falsehood**

134.    Third Party Plaintiff reaffirms, realleges, and incorporates all answers and allegations as set forth herein.

135.    At all times and in all conduct alleged herein, Third Party Defendants did take, assist, and/or fund the publication of tortious statements on behalf of themselves and for the benefit of all other Third Party Defendants.

136.    The publication of these statements resulted in numerous and ongoing interferences with economically advantageous relationships.

137.    Between July 2009 and January 2011, McAuley and Cohen collectively published myriad emails, documents, statements, presentations, and other communications identifying Nichols as the creator and co-founder of Controlbox.com.

138.    Nichols was solicited by an associate at Fraser McCombs Capital on or around February 21st, 2012 to discuss the possibility of investing in Nichols' new company, Rollsale, which did not compete with Controlbox.

23

139.    As the past accomplishments of the co-founders are always considered material

in  investor due diligence, factual details surrounding the founding of Controlbox

were discussed.

140.    McAuley published statements to Fraser McCombs both omitting and explicitly

denying Nichols' involvement as co-founder.

141.    Through McAuley's publication of malicious statements for the dual purposes

of unlawfully soliciting investment as well as avoiding civil and criminal

prosecution, Nichols was forced to defend the truthfulness of his own resumé.

142.    Although Nichols successfully defended his claims, McAuley's false statements

created enough doubt to ultimately deter an investment in Rollsale from Fraser

McCombs.

143.    When Rollsale graduated from Techstars Boulder with 10 other technology

startups in August of 2012, Jacob Cohen of DVP was in attendance however was not

considering Rollsale as a potential investment because of McAuley's fabricated

account of Nichols' "unreasonable demands" in January 2011.

144.    Rollsale, its investors, and its founders suffered from loss of potential

investment due to Third Party Defendants' false and malicious statements.

145.    Nichols suffers from ongoing loss of potential investment in future

entrepreneurial endeavors due to Third Party Defendant's false and malicious

statements.

146.    All tortious and unlawful conduct alleged herein was carried out by McAuley on

behalf of himself and all other Third Party Defendants.

147.    Defendant is entitled to compensatory and exemplary damages and other losses.

WHEREFORE, Defendant and Third Party Plaintiff Michael Nichols prays that as to all counts set forth in the Third Party Complaint and as to all Third Party Defendants, jointly and severally, Third Party Plaintiff be granted the following relief:

1. Dismiss all claims against all named Defendants in Plaintiff's Complaint, with prejudice.

2. For judgment finding the Third Party Defendants tortious and unlawful actions make them liable for any and all damages the court may find to be appropriate relief for the claims of the Plaintiff by its Complaint.

3. Entry of judgment in favor of Third Party Plaintiff for the appropriate sum.

4. For declaratory judgment finding that Third Party Defendants did willfully deceive and unlawfully damage the reputation of Third Party Plaintiff, and that corrective statements be ordered published by Third Party Defendants in a manner deemed appropriate by this Honorable Court.

5. Actual, compensatory, exemplary, incidental, consequential, and any other available damages.

6. An award of all costs and attorney fees sustained by the Third Party Plaintiff in bringing this action.

7. An award of pre-judgment and post-judgment interest.

8. All other appropriate equitable and monetary relief.

**JURY DEMAND**

Defendant and Third party Plaintiff Michael Nichols herein demands a trial by jury on all

issues triable thereto.


Respectfully,

/s/Michael Nichols
Michael Nichols (Defendant Pro Se)
mike@nixco.net
4303 McPherson Avenue
Saint Louis, MO 63108
Telephone: 314-323-5459

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

Controlbox.com, LLC,                              Case no. 14-11069

     Plaintiff,

vs.                                               Honorable Laurie J. Michelson

MICHAEL NICHOLS, et. al.,                         Magistrate Judge R. Steven Whalen

     Defendants,

vs.

STEVEN J. MCAULEY, JOSEPH COHEN, AND MC

INVESTMENTS OF MICHIGAN, INC.,

     Third Party Defendants

---

Michael Nichols (pro se)
mike@nixco.net
4303 McPherson Avenue
Saint Louis, MO 63108
Telephone: 314-323-5459

---

## CERTIFICATE OF SERVICE

I hereby certify that on June 18th, 2014, I electronically filed the foregoing papers with

the Clerk of the Court using the ECF system which will send electronic notices of same to

all counsel of record.

Respectfully,
/s/Michael Nichols
Michael Nichols (Defendant Pro Se)
mike@nixco.net
4303 McPherson Avenue
Saint Louis, MO 63108
Telephone: 314-323-5459